1

2

**E-Filed 9/2/2009**

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                           **SAN JOSE DIVISION**

11

12   BAHMAN M. GHANI,                    | Case Number C 08-2120 JF (PVT)

13                    Plaintiff,          | ORDER[1] GRANTING DEFENDANT'S
                                          | MOTION FOR SUMMARY
14            v.                          | JUDGMENT

15   LOCKHEED MARTIN SPACE SYSTEMS        | [re: doc. no. 25]
     COMPANY, and DOES 1 through 20, inclusive,
16
                     Defendants.
17

18

19        Defendant Lockheed Martin Corporation ("Lockheed Martin") moves for summary

20   judgment on the claims of Plaintiff Bahman M. Ghani ("Ghani") for breach of an implied

21   contract to terminate his employment only for good cause, tortious interference with prospective

22   economic advantage, and violation of Cal. Labor Code § 1050 *et seq*. For the reasons set forth

23   below, the motion will be granted.

24                              **I. BACKGROUND**

25        The following relevant facts are undisputed unless otherwise noted. Ghani was an

26   aerospace engineer at Lockheed Martin from 1980 until his termination in June 2007. Ghani

27

28   ─────────────────────

     [1]  This disposition is not designated for publication in the official reports.

Decl. ¶ 2.  Ghani's initial offer of employment was silent with respect to whether his

employment was at-will.  *See id.*; Ghani Decl. Ex. A.  Since at least 1997, Lockheed Martin has

published an employment policy on its website, which policy provides in relevant part that

"[e]mployment with Lockheed Martin can be terminated at any time with or without cause by

either the employee or Lockheed Martin."  Meccariello Decl. Ex. A at 2.  *See also* Ghani Decl. ¶

3.

> A.  Events Leading to Termination

        In 2004, Ghani was promoted to Manager of Flight Data Collection and Processing Ops,

a position he held until his termination.  *See* Ghani Decl. ¶ 19.  During the relevant period, Ghani

reported to Chris Agler ("Agler"), Senior Manager of the Flight Test and Evaluation Group.  *See*

*id.*  In August 2006, Ghani hired Randy Finch ("Finch") into the department.  At the time of his

hire, Finch was scheduled to be laid off from another department within Lockheed Martin after

being with the company for fifteen years.  *Id*. ¶ 21; Foster Decl. Ex. A at 95.  Finch was the

son-in-law of Bob Hall, a former co-worker of Ghani, and Ghani and Hall were friends, at least

in the workplace.  *See* Ghani Decl. ¶ 21; Foster Decl. Ex. F at 61.  The parties do not dispute that

Finch was the only applicant and that he was hired into an unposted position.  *See* Foster Decl.

Ex. A at 96.  In addition, while it is Lockheed Martin's business practice to have new hires

cleared with department heads, and Ghani did not "recall" asking for permission to hire Finch,

Ghani technically had the authority to make the appointment.  Ghani Decl. ¶ 11; Foster Decl. Ex.

B at 23.

        In October 2006, shortly after being hired into Ghani's group, Finch began a series of

extended absences related to an issue with a family member.  Ghani Decl. ¶ 22; Foster Decl. Ex.

A at 103, Ex. F at 28-29.  At first, Finch used his available vacation and sick leave, but after

Finch exhausted those allotments, Ghani suggested an alternative.  As Finch explained during his

deposition:

> Q:  When you requested the personal time, did you have an
> understanding as to how your timecard would be coded?
>
> A:  I was using I guess vacation and whatever I had, I believe, is
> what they did first.  And then after that, [Ghani] said he could help,

2

and I don't know what the code was but he said there was a code
that's for this.

Foster Decl. Ex. F at 20-21.  Ghani used a code referred to as "PERS," which is "used to record an authorized absence that allows an employee to take care of personal business."  *See* Foster Decl. Ex. A at Ex. L, at 2.  *See also* Ghani Decl. ¶ 25.  This category of absenteeism also is known as "incidental leave," and allows the employee to take paid leave for days that are coded as PERS.  *See* Foster Decl. Ex. A at Ex. O §§ 4.1-4.13.  Any time that is coded as PERS is included in allowable overhead and thus is charged indirectly to Lockheed Martin customers.  *Id.* Ex. D at 34-35.

From October 16, 2006 until the termination of his employment on May 15, 2007, Finch largely was absent from the workplace.  *See* Foster Decl. Ex. F at 54.  Lockheed Martin contends that Finch received eight months of full compensation during this period, without proper authorization and without performing his job.  It is undisputed that between October 16, 2006 and December 31, 2006, Finch's absences were coded as follows:  240 hours of PERS, which was equivalent to thirty days paid leave; forty hours of paid bereavement leave; fifty-six hours of paid vacation; fifty-six hours of paid holiday time; and seventy-two hours of paid sick leave.  *Id.* at Ex. F at Exs. A & B.  From January 1, 2007, to May 11, 2007, Finch's absences were coded as 480.5 hours of PERS (equivalent to sixty days paid), with the final five days later corrected by Agler to unpaid time; 145.5 paid vacation hours; and eighty hours of paid sick leave, for a total of 666 paid hours.  *Id.*; Foster Decl. Ex. A at 134.  Ghani approved the time codes and Finch's absence, and for almost all of the days Ghani entered the time codes personally.  *See* Ghani Decl. ¶¶ 22, 24-25.  In addition, the majority of the days worked by Finch in 2007 were done at his home with Ghani's approval. *See* Foster Decl. Ex. F at 56-57.[2]  Regarding his failure to keep in

---

[2] Finch testified that throughout this time frame, he was unable to work as a result of severe emotional distress that became progressively worse.  *See, e.g.*, Foster Decl. Ex. F at 28-29. According to Lockheed Martin, Ghani's failure to report Finch's absences or the personal problems underlying the absences prevented the company from offering any assistance to Finch under various employee assistance programs.  *See* Meccariello Decl. ¶ 6.  However, Finch's testimony reflected that there had been some lack of success with those alternatives.  Foster Decl. Ex. F at 53-54.

1   contact with Finch during this period, Ghani testified:

2           Q:  Didn't hear from [Finch] at all during the month of April,
        correct?
3
4           A:  I did not.  That's correct.  I wasn't in the office all the time.  I
        was, you know, working on projects and stuff, so I did not pursue
        him to find out where he was.  You know, I lost track of time
5        working on that.

6   Foster Decl. Ex. A at 126.

7           Ghani acknowledges that he fully understood that his use of the PERS code allowed

8   Finch to collect full pay.  *See* Ghani Decl. ¶¶ 29-30.  Ghani's apparent basis for the use of the

9   PERS code was Lockheed Martin's Corporate Policy Statement 534, which sets forth guidelines

10  governing an employee's "Absence From Work" (the "AFW Policy").  *See* Foster Decl. Ex. A at

11  106 & Ex. O.  *See also* Ghani Decl. ¶¶ 25-30.  The AFW Policy describes the applicable

12  procedures for various types of absences authorized by Lockheed Martin, including Personal

13  Leave, Family and Medical Leave, Incidental Absence, and various forms of disability leaves.

14  *See* Foster Decl. Ex. A at 106 & Ex. O.  Ghani believed that the provisions set forth in § 4 of the

15  AFW Policy, which contains the Incidental Absence provisions, governed Finch's situation.[3]  *See*

16  Ghani Decl. ¶¶ 26-29.  As stated in the AFW Policy, an "Incidental Absence" may be granted

17  when time away from work is required for "personal business that cannot be conducted outside

18  of regularly scheduled work hours…Doctor's appointments…[or] illness or injury…that is not

19  Family and Medical Leave Act (FMLA)-qualified and doctor's appointments."  Foster Decl. Ex.

20  A at Ex. O § 4.1.  Absences under this category are approved by an employee's "immediate

21  manager" and may be taken for a "maximum of seven consecutive full or partial calendar days

22  for each approved absence."  *Id.* §§ 4.11, 4.12.  In addition, "[t]he absence may be paid or

23  unpaid.  Generally, you will be paid for a reasonable number of Incidental Absences.  The

24  _____

25          [3] Ghani does not appear to argue that § 10 of the AFW Policy could have applied to
26  Finch's situation.  That section covers "Personal Leave," and allows such leave to be taken for up
    to one year.  Foster Decl. Ex. A at Ex. O § 10.4.  However, leave under this category is unpaid,
27  and it is undisputed that Finch was paid for almost all of the days he was absent.  In addition,
    Personal Leave would have required prior approval by Lockheed Martin's human resources
28  department.  *Id.* § 10.3.

                                        4

Case No. C 08-2120
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

1   number of Incidental Absences, however, is not unlimited." *Id*. § 4.13. Ghani believed that he

2   only had to notify human resources in case he did not approve the Incidental Absence without

3   pay, as set forth in § 4.14 of the AFW Policy. *See* Ghani Decl. ¶ 29. Ghani further believed that

4   the PERS code, as it was defined in Lockheed Martin's attendance codes for salaried employees,

5   was the appropriate code for Finch's Incidental Leave. *Id*. ¶ 34.

6          According to Lockheed Martin, employees charge the actual hours that they have worked

7   to the corresponding government project, while overhead costs, vacation, sick leave, and

8   personal paid leave are distributed across all of Lockheed Martin's customer contracts, including

9   U.S. Government contracts. Meccariello Decl. ¶ 2; Foster Decl. Ex. D at 33; *Id.* Ex. J at 41.

10  Lockheed Martin maintains that proper time coding is required by law, even for overhead

11  charges, and therefore proper practices are emphasized in company policies and training.

12  Meccariello Decl. ¶ 2. *See also* Foster Decl. Ex. J at 39-41 ("mischarging is theft from the

13  Customer and Lockheed Martin," even where it involves overhead-related time keeping).

14  Lockheed Martin also states that mischarging of time may result in suspension or even debarment

15  from its status as a U.S. Government contractor, subjecting the company to liability under the

16  Civil False Claims Act. Meccariello Decl. ¶ 2.[4] Lockheed Martin has submitted unrebutted

17  evidence that there is little tolerance for miscoding of time, in that if an allegation of mischarging

18  is substantiated following an investigation by the human resources department, termination of

19  employment is the recommended discipline, irrespective of the amount time involved or the

20  length of the employee's tenure with the company. *See* Foster Decl. Ex. E at 39; *Id*. Ex. I at 37-

21  38; *Id*. Ex. J at 36-37. Indeed, during 2006 and 2007 alone, Lockheed Martin terminated the

22  employment of at least sixteen people (not including Ghani) for mischarging, four of whom had

23  more than twenty years with the company, some for incidents of miscoding involving fewer than

24

25          [4] There is no actual dispute that the correct charging of time was a essential part of
    Ghani's job. During his deposition, Ghani testified that (1) "charging time correctly" is a core

26  job requirement; (2) the requirement that employees charge time correctly was discussed in the
    company's annual ethics training; (3) Ghani attended labor charging training in 2006 and 2007;

27  (4) as a manager, it was Ghani's responsibility to make sure that his direct reports accurately
    reported all time charges; and (5) mischarging may affect Lockheed Martin's relationship with

28  the U.S. Government. *See* Foster Decl. Ex. A at 78-82.

Case No. C 08-2120
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

1    six days.  *See* Meccariello Decl. ¶ 3.

2              <u>B.  Lockheed Martin's Investigation and Ghani's Termination</u>

3           On May 7, 2007, Agler met with Ghani to discuss various issues involving Ghani's job

4    performance, including an allegation by several of Ghani's subordinates that they felt Ghani had

5    been absent from the workplace too frequently because of travel responsibilities.  *See* Foster

6    Decl. Ex. A at 129; *Id.* Ex. B at 70.  At that meeting, Ghani informed Agler that he was

7    considering the possibility of stepping down from his manager position.  Ghani Decl. ¶ 37.  The

8    next day, Ghani voluntarily stepped down as manager, as he believed his skills were better suited

9    to field work than to administrative tasks.  *See id.*  Ghani's decision made Agler the direct

10   supervisor of Finch.  *See* Foster Decl. Ex. A at 128.  On May 9, 2007, Ghani first told Agler that

11   he had not heard from Finch.  *See id.* at 126.  In fact, at this point Ghani had not received any

12   communication from Finch since March 27, 2009, and Finch had failed to respond to two emails

13   sent by Ghani in April 2007.  *Id.* at 126-127.  It is undisputed that Ghani did not discuss Finch's

14   requests for time off with Lockheed Martin's human resources department, nor did he ask the

15   human resources department what time code should be used for Finch's absences.  *See id.* at 137-

16   39.

17          Prior to these discussions with Ghani, Agler had believed that Finch had been granted a

18   leave of absence.  *See* Foster Decl. Ex. B at 44.  When informed by Ghani that Ghani had used

19   the PERS code for a period in excess of seven consecutive days, Agler asked if Ghani had

20   secured approval for such action.  *Id.* at 45-46.  When Ghani informed Agler that such approval

21   had not been obtained, Agler then met with a representative in Lockheed Martin's human

22   resources department to discuss the situation.  In particular, Agler was concerned that Finch had

23   been absent from work for an extended period of time and that Ghani apparently had miscoded

24   the time.  *See* Meccariello Decl. Ex. B at LM 125.  Agler also corrected forty hours of time in

25   Finch's most recent pay period from PERS to LSTU (lost time/unpaid), which is not charged to

26   customers.  *Id.*; Foster Decl. Ex. B at 57.  Finch was terminated shortly thereafter for abandoning

27   his job.  Meccariello Decl. Ex. B at LM 125.

28          Lockheed Martin then assigned Ryan Keyt ("Keyt") to investigate Ghani's alleged

6

1    miscoding.  Foster Decl. Ex. H at 19-20.  During his deposition, Keyt testified that he had

2    investigated approximately ten to fifteen incidents of mischarging in the five years prior to the

3    incident in question.  Mezzetti Decl. Ex. A at 11.  As part of his investigation, Keyt conducted

4    in-person interviews with Ghani and Agler and reviewed Ghani's personnel file.  Foster Decl.

5    Ex. H at 26, 33, 49.  Ghani also submitted a written statement as part of the investigation, which

6    included the following:

> I reviewed the time charging command media and realize now that
> I had misunderstood the description and guidelines for the PERS
> time code…I did bring the direct report's family crisis to my Sr.
> Manager's attention but the time coding did not come up in our
> discussions.  The last email I received from the direct report was
> 26 March 2007 and the last telecom was on 27 March advising me
> he need [sic] two more weeks to resolve most of the family crisis
> and return to work…I regret the misunderstanding and impact that
> it has caused.  I have begun a corrective action to thoroughly
> review all time charging command media to prevent any recurrence
> of this or any kind.  In hindsight, I should have obtained guidance
> from my Sr. Manager and HR on how to proceed in this situation.
> My only intention was the overall well being of [Finch] in enabling
> him to concentrate on his family crisis and get back to work as
> soon as possible.  Again, I believed at the time I was proceeding
> properly and truly regret my mistake.

Meccariello Decl. Ex. B at LM 127.

        By May 17, 2009, Keyt had completed his investigation and had prepared a written

report.  *See* Meccariello Decl. Ex. B at LM 117.  The report listed two specific allegations of

misconduct:  (1) "Minor Mischarging–Inappropriate approval of excessive paid personal time;"

and (2) "Management Practice and Performance–Inappropriate application of policy and failure

to appropriately manage."  *Id*. at 118.[5]  At his deposition, Ghani testified that the facts underlying

the relevant allegations of misconduct had been described accurately in Keyt's report.  *See* Foster

Decl. Ex. A at 125-26, 133-36.  The results of Keyt's investigation then were presented to

Lockheed Martin's Administrative Review Committee ("ARC"), which ultimately recommended

that Ghani be terminated.  *See* Meccariello Decl. Ex. B at LM 115.  The parties dispute whether

---

        [5] At his deposition, Keyt testified that he used the term "minor" to characterize the
miscoding because Ghani had coded the time for another employee, rather than himself.  Foster
Decl. Ex. G at 127-28.  However, in terms of the actual misconduct, Keyt considered the incident
to be relatively severe due to the number of hours involved.  *See* Mezzetti Decl. Ex. A at 12.

1 certain individuals should have been members of the ARC, as well as who was involved in the

2 ultimate decision to terminate Ghani, but for purposes of resolving the instant motion the Court

3 must treat Ghani's factual allegations as true.  Accordingly, it is unnecessary to recount any

4 additional details relevant to the investigation.  As a result of his termination, Ghani's security

5 clearance for U.S. Government contracts was suspended.  *See* Ghani Decl. ¶ 46.

6         <u>C. Events Subsequent to Termination</u>

7         In July 2007, Ghani was contacted by L3 Communications ("L3C") about a possible

8 position with the company.  *See* Ghani Decl. ¶ 45.  Ghani informed L3C about his termination

9 from Lockheed Martin in an email dated July 21, 2007:

10                      Here is summary of what happened:

11                      An employee working for me had a personal family crisis that
                     required his taking time to resolve. I, unaware of the limitations of

12                      the timecard code for taking personnel [sic] time, incorrectly coded
                     him for many weeks. Since I thought I was acting correctly, I did

13                      not inform HR of his situation. HR investigated and decided that I
                     had acted improperly and terminated me.  If I had known of the

14                      timecode limitations, I would have proceeded differently.

15 Foster Suppl. Decl. Ex. A.[6]  On August 20, 2007, LC3 extended an offer to Ghani, contingent

16 upon Ghani securing an appropriate security clearance.  *See* Ghani Decl. ¶ 45.  In September

17 2007, LC3 informed Ghani that his prior security clearance could not be transferred because it

18 had been suspended.  *Id*. ¶ 46.  L3C subsequently rescinded its offer of employment.  *See id.*

19         On September 14, 2007, Ghani received an offer of part-time employment from his

20 present employer, Trident Research LLC ("Trident").  *See* Ghani Decl. ¶ 52.  Ghani's part-time

21 salary was less than half of what his salary would have been at LC3 had he been hired.  *See id.* ¶¶

22 45, 52.  Ghani eventually was offered a full-time position with Trident, after undergoing a

23 complete security background check and receiving a new security clearance.  *See* Starcevich

24

25       [6] Ghani objects to Lockheed Martin's submission of a supplemental declaration in

26 support of its reply brief on the ground that such evidence should have been submitted in
conjunction with the opening brief.  However, Civ. L.R. 7-3(c) permits the submission of

27 affidavits or declarations with a reply brief, and at least the portions relevant to the resolution of
the instant motion were submitted in response to arguments made in Ghani's opposition.  *See*

28 Fed. R. Civ. P. 56(e)(2).

Case No. C 08-2120
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

Decl. Ex. I at 46-48; Ghani Decl. ¶ 55.

## II. LEGAL STANDARD

Summary judgment should be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, or other evidence that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, and instead must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49.

## III. DISCUSSION[7]

### A. At-Will Employment and Implied Agreement to Terminate only for Good Cause

Under California law, and in the absence of any agreement to the contrary, a term of employment may be terminated at any time, with or without cause. *See* Cal. Labor Code § 2922 ("An employment, having no specified term, may be terminated at the will of either party on notice to the other."); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 335 (2000) ("An at-will employment may be ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure except the statutory requirement of notice."). The statutory presumption created by § 2922 may be altered contractually by either an express or an implied agreement.

---

[7] Because this Court's subject matter jurisdiction is based on diversity of citizenship between the parties, the substantive law of the forum state governs the instant dispute. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

1   *Guz*, 24 Cal. 4th at 335-336 ("though Labor Code section 2922 prevails where the employer and

2   employee have reached no other understanding, it does not overcome their

3   'fundamental…freedom of contract' to depart from at-will employment.  The statute does not

4   prevent the parties from agreeing to any limitation, otherwise lawful, on the employer's

5   termination rights.") (citing *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680, 696 (1988)).

6          Ghani first argues that because he never signed any agreement expressly designating that

7   his employment was at-will, Lockheed Martin could terminate him only for good cause.

8   However, in the absence of any agreement to the contrary, the default rule is that employment is

9   at-will, and thus in such circumstances there is no obligation than an employer show good cause

10  prior to termination.  *Foley*, 47 Cal. 3d at 680 ("Pursuant to Labor Code section 2922, if the

11  parties reach no express or implied agreement to the contrary, the relationship is terminable at

12  any time without cause.").  Ghani also argues that certain events led him to believe that there was

13  an implied agreement to terminate only for good cause.  An implied contractual agreement to

14  terminate only for good cause may arise "from the parties' conduct evidencing their actual

15  mutual intent to create such enforceable limitations."  *Guz*, 24 Cal. 4th at 336.  The existence of

16  an implied contract is a question of fact.  *See id.* at 677.  Relevant factors in the determination of

17  whether such an implied agreement existed include "the personnel policies or practices of the

18  employer, the employee's longevity of service, actions or communications by the employer

19  reflecting assurances of continued employment, and the practices of the industry in which the

20  employee is engaged."  *Id*. at 680 (quoting *Pugh v. See's Candies, Inc*., 116 Cal. App. 3d 311,

21  327 (1981)).

22         With respect to the first *Pugh* factor, it is undisputed that the policies posted on Lockheed

23  Martin's intranet at all times relevant herein stated that employment at Lockheed Martin was at-

24  will.  *See* Meccariello Decl. Ex. A at 2.  *See also id.* at 4 (termination may be "immediate[]" and

25  without any corrective procedures); *id*. at 5 (all salaried employees are employed at-will and

26  employment may be terminated "at any time, with or without cause, and with or without

27  notice."); *id*. at 6 ("initial discipline" may include termination).  At his deposition, however,

28  Ghani testified that he had not viewed any of these policy statements.  Starcevich Decl. Ex. J at

10

59.  He also testified that he had never discussed with Lockheed Martin whether his employment was at-will or whether good cause was required for termination.  *Id*. at 61-63.

The second *Pugh* factor, longevity of service, supports the existence of an implied agreement.  As to the third factor, Ghani admitted during his deposition that Lockheed Martin never made an express promise that he would be terminated only for good cause:

> Q:  Did anyone at Lockheed Martin Corporation ever tell you that the company's at-will statements or at-will policies did not apply to your employment at the company?
>
> A:  I never had discussions about that with anybody.
>
> Q:  So the answer would be no?
>
> A:  No.
>
> Q:  Okay. Have you ever discussed the concept of termination for good cause with anyone at Lockheed Martin Corporation?
>
> A:  No.
>
> Q:  Did anyone at Lockheed Martin Corporation ever tell you that you were guaranteed to be employed at the company for a specific period of time, or words to that effect?
>
> A:  That it was guaranteed?
>
> Q:  Yes.
>
> A:  No.

Starcevich Decl. Ex. J at 62.  Instead, Ghani testified his positive performance reviews created an implied agreement:

> I mean I guess it was just that I had done a good job and, therefore, I had a future with Lockheed, is the way it was stated.  Because I performed well, and they liked what I did, and, therefore, it was implied that, you know, they would promote me and give me raises and stuff to work there.

*Id.* at 64-65.  Ghani contends that his generally positive performance reviews were signals by Lockheed Martin that "implied" an agreement to terminate only for good cause.  *See id.* at 65-66 ("good performance reviews, and raises and promotions" constituted "implied signals that I was doing a good job and, therefore, I would keep having a job there.").

Case No. C 08-2120
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

1    To the extent that longevity and promotions may support the existence of an implied

2    agreement, such events, without more, are insufficient under California law to alter the statutory

3    presumption created by § 2922.  *See Guz*, 24 Cal. 4th at 341-42 ("an employee's *mere* passage of

4    time in the employer's service, even where marked with tangible indicia that the employer

5    approves the employee's work, cannot *alone* form an implied-in-fact contract that the employee

6    is no longer at will.").  Otherwise, an implied agreement to terminate only for good cause could

7    be created simply by an employee doing his or her job, a rule that is not contemplated by § 2922

8    or by any of Lockheed Martin's employment policies.  *See id.* ("A rule granting such contract

9    rights on the basis of successful longevity alone would discourage the retention and promotion of

10   employees.").  *See also Carter v. CB Richard Ellis, Inc.*, 122 Cal. App. 4th 1313, 1329 (2004)

11   ("longevity, raises and promotions are their own rewards for the employee's continuing valued

12   service; they do not, in and of themselves, additionally constitute a contractual guarantee of

13   future employment security.") (quoting *Guz*, 24 Cal. 4th at 342).  Nor does the existence of

14   certain policies governing employee discipline change Ghani's employment status.  *See Davis v.*

15   *Consol. Freightways*, 29 Cal. App. 4th 354, 367 (1994) (discipline policy did not change at-will

16   status because otherwise "an employer would be forced purposely to terminate employees for any

17   and every infraction-or none at all-in order to maintain the presumption of at-will employment.

18   The law does not require such caprice to avoid creating an implied in fact contract."); *Anderson*

19   *v. Union Pac. R.R. Co.*, No. S-06-2813, 2008 WL 2130320, at *7 (E.D. Cal. May 21, 2008) ("the

20   existence of a disciplinary process does not rebut the presumption of at-will employment

21   status.").  Finally, no evidence has been presented as to standard industry practices.  Under all the

22   circumstances, the Court concludes that there was no implied agreement between the parties that

23   altered Ghani's at-will status.

24   Because it is undisputed that Lockheed Martin made no statements that reasonably could

25   have been construed to create a "specific understanding" that Ghani could be terminated only for

26   good cause, *see Guz*, 24 Cal. 4th at 342, summary judgment in favor of Lockheed Martin is

27   appropriate.  *See Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1386 (1999)

28   (where the relevant facts are undisputed, the existence of an implied agreement to terminate only

12

1   for good cause may be adjudicated as a matter of law).[8]

2       B.  Miscoding Constituted Good Cause

3       Even if there were a triable issue of fact as to the existence of an implied agreement,

4   Ghani still would have to show that Lockheed breached that agreement.  *See Moreau v. Air*

5   *France*, 356 F.3d 942, 954 (2004) ("To succeed on his claim, [the former employee] had to prove

6   not only that there was an implied-in-fact contract, but also that Air France breached that

7   agreement.").  Ghani contends that the investigation was inadequate and that his termination thus

8   was improper.  An employee may be terminated for good cause where there is a "factual basis on

9   which the employer concluded a dischargeable act had been committed reached honestly, after an

10  appropriate investigation and for reasons that are not arbitrary or pretextual."  *Cotran v. Rollins*

11  *Hudig Hall Int'l., Inc.*, 17 Cal. 4th 93, 107 (1998).  *See also Miller v. United Parcel Serv., Inc.*,

12  No. C 03-2405, 2004 WL 1771571, at *13 (N.D. Cal. Aug. 6, 2004) ("Under the rule articulated

13  in *Cotran*, the question is … [whether the employer] has provided undisputed evidence that the

14  decision to terminate plaintiff was objectively reasonable and arrived at honestly and in good

15  faith after a fair and appropriate investigation.").  Specifically, Ghani attacks his termination on

16  the ground that the ARC's decision was arbitrary, but his conclusory argument is refuted by

17  undisputed evidence to the contrary.[9]  The record shows that Lockheed Martin investigated the

18  incident, that Ghani had a full and fair opportunity to explain his version of the relevant events

19  and the basis of his misunderstanding of the relevant policies, and that he admitted the alleged

20  wrongdoing.  Such circumstances demonstrate that there was an adequate investigation as a

21  _____

22      [8] Ghani's reliance on *Reid v. Smithkline Beecham Corporation*, 366 F. Supp. 2d 989 (C.
    D. Cal. 2005) is unavailing.  In *Reid*, the plaintiff survived a motion summary judgment on her
23  claim of breach of an implied agreement to terminate only for cause because she testified that
    express promises had been made as to a good cause requirement.  *See id.* at 995 ("Plaintiff
24  …declared, under the penalty of perjury, that she was expressly told by her supervisors that she
    would not be terminated without cause.").  *See also Guz*, 24 Cal. 4th at 342.
25

26      [9] Ghani's statements in his declaration in support of his opposition to the instant motion
    contradict statements made during the investigation, as well as his admission during his
27  deposition that he did not code Finch's time correctly.  Ghani's argument that he was pressured
    to admit his mistake is tempered by the fact that he affirmed the accuracy of the allegations
28  during his deposition, after he had lost his job.  *See* Foster Decl. Ex. A at 134-36.

1  matter of law.  *See King v. United Parcel Serv., Inc.*, 152 Cal. App. 4th 426, 440 (2007)

2  ("Because neutral personnel investigated the facts, eyewitnesses provided statements, and

3  plaintiff was given an opportunity to explain what happened, we conclude UPS conducted an

4  adequate investigation as a matter of law.").[10]

5          To the extent that Ghani is alleging that his termination was improper because Lockheed

6  did not follow its own discipline policy to the letter, such an allegation does not affect the

7  ultimate disposition.  The undisputed evidence shows that Lockheed had the right to terminate

8  Ghani.  Ghani testified that he reviewed the provision in the AFW Policy limiting an Incidental

9  Absence to seven consecutive days or less, and that he reviewed the relevant codes and selected

10  "PERS" code to categorize many of Finch's absences.  *See* Foster Decl. Ex. A at 106-07.

11  Nonetheless, Ghani testified that, despite the time limit language, Finch was eligible for

12  additional PERS coding if he made an additional request for more time during the first seven

13  days of an absence.  *Id.* at 107-109.  Not only does this reading of the AFW Policy eviscerate the

14  seven-day limitation rule, but also the fact that Finch and Ghani had no contact at all for the final

15  six weeks of Finch's absence belies Ghani's *ex ante* interpretation.[11]  Nor may Ghani seek

16  selective enforcement of certain portions of company policies when there are other policies that

17  give Lockheed Martin the unequivocal right to terminate him without good cause.

18          Finally, Ghani contends that the mere possibility that Lockheed *might* have imposed a

19  lesser punishment *if* a more thorough investigation had been conducted or if the ARC process

20  had been flawless precludes summary judgment.  California law provides otherwise.  *See Pugh v.*

21  *See's Candies, Inc.*, 203 Cal. App. 3d 743, 769 (1988) ("In any free enterprise system, an

22  employer must have wide latitude in making independent, good-faith judgments about

23  _____

24          [10] It is worth emphasizing that Ghani does not contest the facts surrounding Finch's
extended absences, but rather that Ghani had the right to approve such absences and code them as

25  PERS.

26          [11] At least several other codes on Lockheed Martin's coding list might have been more
appropriate for categorizing Finch's absences, including FMIP (FMLA -Paid Intermittent),

27  FMLP (short term care for kin), and FMLU (unpaid FMLA leave).  Personal leave under § 10 of
the AFW Policy also could have been used, but as discussed previously such leave would have

28  been unpaid and would have required prior approval from the human resources department.

1  high-ranking employees without the threat of a jury second-guessing its business judgment.").  In

2  effect, Ghani is asking that a jury be allowed to reevaluate facts that clearly were sufficient to

3  support his termination.  Ghani may have been merely careless and may have had the best of

4  intentions with respect to his subordinate who was under considerable distress, but such

5  considerations ultimately are immaterial to the concerns faced by a defense contractor that

6  depends upon proper time coding.  *See id.*  Accordingly, Lockheed Martin's motion will be

7  granted with respect Ghani's claim for breach of the implied agreement to terminate only for

8  good cause.

9       C.  Intentional Interference with Prospective Economic Advantage

10       Under California law, a claim for intentional interference with prospective economic

11  advantage requires: "(1) an economic relationship between the plaintiff and some third party,

12  with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of

13  the relationship; (3) intentional acts on the part of the defendant designed to disrupt the

14  relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

15  proximately caused by the acts of the defendant."  *Korea Supply Co. v. Lockheed Martin Corp.*,

16  29 Cal. 4th 1134, 1154 (2003).  In addition, the alleged misconduct must have been "wrongful by

17  some legal measure other than the fact of interference itself."  *Della Penna v. Toyota Motor*

18  *Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).  "[A]n act is independently wrongful if it is

19  unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or

20  other determinable legal standard."  *Korea Supply*, 29 Cal. 4th at 1109.

21       Ghani's intentional interference claim is based Lockheed Martin's disclosure to the U.S.

22  Government of the reason for his termination.[12]  Ghani argues that because he was not guilty of

23  misconduct, Lockheed Martin committed libel (*i.e.*, an independently wrongful act) when it

24  informed the government about the reason for his termination.  However, as discussed above,

25  Ghani's miscoding of personnel time was improper, and it constituted misconduct that justified

26

27       [12] Ghani also alleges a claim based on Lockheed Martin's refusal to allow him entry onto
28  the Lockheed Martin campus for a meeting involving his new employer, but in his opposition
   Ghani concedes that those allegations are inadequate to support his tort claim.

15

the termination.  In his deposition, Ghani essentially conceded that the miscoding was improper:

> Q:  All right. I understand, Mr. Ghani that you do not believe you should have been terminated. I get that. That's why we're here.
>
> A:  Right.
>
> Q:  But the reason that was communicated to you was misconduct, correct?
>
> A: That's what was in the letter. That's correct.
>
> Q: And you would agree with me, would you not, that if Ms. Herte communicated to the government only that your employment had been terminated for misconduct, then Ms. Herte provided to the government a true statement, correct?
>
> A:  That is correct.

Foster Supp. Decl. Ex. A at 45.  Accordingly, Lockheed Martin could not have defamed Ghani, because the statement it provided to the government was true.  *See Hughes v. Hughes*, 122 Cal. App. 4th 931, 936 (2004) (a showing that a statement was "substantially true" constitutes a defense to a defamation claim).

In addition, Lockheed Martin argues—and Ghani does not meaningfully dispute—that its communication to the government, even if false, was privileged.  Cal. Civ. Code § 47(b) bars any tort actions for defamatory statements made in conjunction with any "official proceeding authorized by law."  *Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350, 360 (2004) (quoting Cal. Civ. Code § 47(b)).  Ghani contends that Lockheed Martin had no duty to report that he had been terminated for misconduct, but this argument conflicts with his own earlier deposition testimony acknowledging that Lockheed Martin was required to report the reason for his termination, *see* Foster Decl. Ex. A at 38-39, as well as documentation indicating that the government required Lockheed Martin to report terminations and, where the termination is due to misconduct, a description of the misconduct.  *See* Meccariello Decl. Ex. C at LM 639, LM 772.  As argued by Lockheed Martin, any communications were privileged under Cal. Civ. Code § 47(b).[13]

---

[13] Moreover, it appears that Lockheed Martin did not inform Ghani's current employer as to reason for the termination, even when pressed.  *See* Foster Decl. Ex. C at 16-17.  Perhaps anticipating the deficiencies in his claim for intentional interference with prospective economic advantage, Ghani requests leave to amend his complaint to add a claim for negligent interference with prospective economic advantage.  However, for the reasons discussed above, such an

16

1    D.  Cal. Labor Code § 1050 et seq.

2        California Labor Code §1050 *et. seq*. prohibits a misrepresentation to a prospective

3    employer that prevents, or attempts to prevent a former employee from obtaining new

4    employment.  *See Kelly v. Gen. Tel. Co.*, 136 Cal. App. 3d 278 (1982).  For the reasons set forth

5    above with respect to Ghani's tort claim, the Court will grant summary judgment in favor of

6    Lockheed Martin.  *See O'Shea v. Gen. Tel. Co.*, 193 Cal. App. 3d 1040, 1047 (1988).

7                                **IV.  ORDER**

8        Good cause therefor appearing, IT IS HEREBY ORDERED that Lockheed Martin's

9    motion for summary judgment on all of Ghani's claims for relief is GRANTED.[14]  The Clerk

10   shall enter judgment and close the file.

11

12

13   DATED: September 2, 2009

14

15                              _____

16                              JEREMY FOGEL
                                United States District Judge

17

18

19

20

21

22

23

24   _____

25   amendment would be futile; the request will be denied.  *See Dumas v. Kipp*, 90 F.3d 386, 393
     (9th Cir. 1996).
26

27       [14] Lockheed Martin's objections to certain evidence submitted by Ghani in support of his
     opposition to the instant motion are overruled to the extent that such evidence was not required
28   to resolve the instant motion.  Otherwise, the Court has considered all relevant evidence, viewed
     in the light most favorable to Ghani.

Case No. C 08-2120
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

This Order has been served upon the following persons:

David J. Cardiff     dcardiff@fosteremploymentlaw.com, smeyers@fosteremploymentlaw.com

Emily R. Epstein     eepstein@fosteremploymentlaw.com, smeyers@fosteremploymentlaw.com

Margaret Jean Starcevich     jean.starcevich@gmail.com, julie_marotta@yahoo.com

Michael W. Foster     mfoster@fosteremploymentlaw.com, tsmith@fosteremploymentlaw.com

Robert Louis Mezzetti , II     rob@mezzettilaw.com, jam@mezzettilaw.com

Case No. C 08-2120
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)